Matthew M. Levy, J.
The premises here involved were a one-family house prior to 1947, and thereafter the property was converted into a rooming house. Ownership was acquired by the petitioner in 1949. From the year of 1957 and continuously until the institution in this court, in pursuance of article 78 of the CPLR, of the present proceeding in 1966, the premises were the subject of administrative and judicial processes.
*123 The final orders in the several article 78 proceedings already had herein may be enumerated as follows:
1. Order of Flynn, J., July 12, 1957;
2. Order of Flynn, J., February 27,1958;
3. Order of Fine, J., September 9, 1960;
4. Order of Backer, J., August 15, 1961 ;
5. Order of Helman, J., June 18, 1964.
In the circumstances, were there certain rules of court in effect, it might have been appropriate to refer the present proceeding to one of my learned colleagues who had already passed upon the relevant issues (see what I had to say on this subject in Silverman v. Rogers Imports, 4 Misc 2d 672, 673-674 and in Simmons & Assoc. Research v. Ziff-Davis Pub. Co., 37 Misc 2d 62, 64; cf. Weinstein, Standing Masters to Supervise Discovery, 23 F. R. D. 36, 40). But I refrained from attempting to do so, for under existing procedures that is not to be. And as I read the recently adopted CPLR, 2217 (subd. [a]) does not necessarily apply, since each article 78 proceeding may perhaps be regarded as a separate suit.
The result was that it remained my lot to be still another Judge obligated to re-examine from its inception the very bulky and sometimes confusing mass of documents involving this property. Hopefully, by undertaking once again a thorough study and complete analysis of the entire record — including the administrative proceedings giving rise to and arising from the judicial determinations — the court will finally be able to cut the Gordian knot in this litigation, and, once for all, bring to a final termination this protracted controversy.
By order and determination of the Temporary State Housing Rent Commission, dated March 8, 1957, dominion was exercised over the premises as being subject to rent control under the then existing statute and regulations. On July 12, 1957, the court (Flynn, J.) denied the landlord’s application for an article 78 review and annulment. Thereafter, on February 27, 1958, the court (Flynn, J.) granted the petitioner’s motion for reargument and, thereon, ordered decontrol of the subject premises as rooming house accommodations by virtue of their conversion from a single-family residence to a rooming house after February 1,1947, but prior to May 1,1950. Judge Flynn’s decision was within the purview of Matter of Hutchins v. McGoldrick (307 N. Y. 78), in which the Court of Appeals held that additional housing accommodations created by conversion between those dates were exempt from the rent control then statutorily provided.
*124 Subsequently, and on July 1, 1959, section 2 (subd. 2, par. [g], cl. [2]) of the Emergency Housing Rent Control Law (L. 1946, ch. 274, as amd. by L. 1950, ch. 250) was amended (L. 1959, ch. 695) thereby nullifying the applicability of the Hutchins holding, upon which basis Judge Flynn had decontrolled the premises. The effect of the enactment — as projected by the 1959 Report of the State Commission to Study Rents and Rental ■Conditions (N. Y. Legis. Doc., 1959, No. 45, pp. 20-21) and as interpreted by pertinent administrative regulations — was to recontrol rooming house accommodations created by conversion during the period from February 1,1947, to May 1,1950, upon a finding that such premises had (1) deteriorated to slums, but (2) nevertheless are rented at excessively high rentals because of their prior decontrolled status.
Under this amendment and by determination of May 27,1960, the State Rent Administrator reassumed jurisdiction. Thereafter, in a subsequent article 78 proceeding brought on by the landlord, the court (Fine, J.) on September 9, 1960 — holding that there was insufficient evidence in the record upon which to justify a finding that the premises had deteriorated to a slum —.remitted the matter to the State Administrator, “ for the purpose of taking proof, on notice to petitioner, as to whether the condition of the premises justifies the restoration of rent control in furtherance of the legislative purpose in enacting the 1959 amendment. ”
The Administrator made an inspection of the premises on January 12,1961. Following this inspection, and prior to March 3, 1961, it appears that, during the occupancy of the premises as a rooming house, certain repairs, at a cost of some $2200, were made, which the petitioner contended removed sufficiently the slum condition thereof to warrant decontrol. After reconsideration pursuant to Judge Fine's order, a finding was made by the Administrator that the premises were still a slum, and by decision dated April 10, 1961, he reaffirmed the prior determination of recontrol.
Upon such further administrative recontrol, another article 78 proceeding was instituted. By order of August 15, 1961, the matter was again remanded, the court (Backer, J.) stating: “ Upon the record herein it appears that the rent administrator in fixing the maximum rents for the rooming house units did not consider the repairs and alleged improvements made subsequent to its physical inspection of the premises on January 12, 1961. Accordingly this proceeding is remanded to the Temporary Housing Rent Commission for re-inspection of the subject *125 premises and re-establishing its rents with due consideration to be given to the bona fide improvements, and having regard for any factors bearing on the equities involved. ”
Of course, while the essence of Judge Backeb’s decision is that there were certain improvements which may have had some impact upon the permissible rentals, it is necessarily implicit in this holding that these premises were recontrolled and were subject to control of the Bent Administrator under the foregoing statutory amendment and regulations.
The Administrator thereafter caused another physical inspection to be made, and the report thereof is dated November 3, 1961. However, the next determination by the Administrator was not made until April 30, 1964, and the landlord’s protest was then again denied. (There is no explanation for the hiatus between the time of last inspection of November 3, 1961, and the time of the order of April 30, 1964, except insofar as it may be implied from the change of administrative control from the State to the city on May 1,1962. [Local Emergency Housing Rent Control Act, enacted Feb. 17, 1962, by L. 1962, ch. 21].)
While the matter thus remained in limbo, administratively and litigiously, three significant events occurred: (1) Local Laws, 1962, No. 20 of the City of New York, providing, among other things, for municipal control, decontrol and recontrol of certain premises, including rooming house accommodations, was enacted; (2) section 11 of the City Bent, Eviction and Behabilitation Begulations, providing, among other things, for the decontrol of rooming houses converted to self-contained apartment dwellings, was promulgated; and (3) there had been total voluntary surrender of possession by the rooming house occupants of the subject premises and there was' conversion from rooming house to self-contained family housing units, at a cost to the landlord of some $32,000.
Another article 78 proceeding was instituted, and apparently for the reason that the intervening statute and regulation and conversion had not received attention in the Administrator’s determination of April 30, 1964 — made almost three years after the last proceeding remand — and, also apparently for that reason as well, the matter was again remanded (this time on consent) by the court’s order of June 18,1964 (Helman, J.).
Upon that remand, there was a further inspection by the Administrator and there were further proceedings before him. Occupancy was then under leases and rents were fixed by the agreements with the tenants. Eventually, a determination by the Administrator was made, dated April 15, 1966, fixing rents *126 at the levels specified in the leases and denying decontrol. It is that decision which is now under direct review before me.
After careful study of the entire record, I find that the issue to be decided here is a very narrow one — the various administrative rulings and the landlord’s protests and the prior article 78 proceedings and orders notwithstanding. There is no complaint by the landlord that the Administrator — in fixing the rents to be paid by the tenants of the newly established residential accommodations — refused or failed to take into account the expense incurred by the landlord in converting and improving the premises. Quite the reverse. There was no interference by the Administrator with the bargaining undertaken between the landlord and the tenants. The Administrator recognized that “new maximum rents must be established to reflect the current values ”. All of the rents provided for in the respective leases with the tenants have been approved by the Administrator — so the landlord does not raise any objection in this connection. The only question now tendered is whether these housing accommodations can qualify for decontrol, and, if so, whether they do qualify. Confined though the issue is, its resolution does not permit of circumscribed consideration — for several problems must be given attention.
It is a principal contention of the landlord — and this has been the case in all of the prior as well as the instant article 78 proceedings — that Judge Flynn’s order is the law of the case, so that, when the premises could no longer be considered a slum, it was subject to decontrol thereunder. I do not agree with this contention. It is my view that Judge Flynn’s decision was the law of the case until the time of the 1959 amendment of the Emergency Housing Rent Control Law aforesaid, which permitted recontrol of rooming houses.
On the other hand, the Administrator argues that Judge Backer’s decision is the law of the case. That would ordinarily be so — at least by implication. Judge Fine had required a determination as to whether or not such slum conditions existed as to warrant recontrol, and the Administrator did in fact make such a finding in its order dated April 10, 1961. Reviewing this determination Judge Backer — while not referring to the matter of “ slum conditions ”, or for that matter, to the issue of decontrol as raised by the petitioner — did note (as I have hereinbefore pointed out) that improvements were made after the physical inspection of the premises on January 12, 1961, which is subsequent to the date of Judge Fine’s decision. And, as has been seen, Judge Backer directed that the proceeding be 11 remanded to establish controlled rentals in accordance with *127 bona fide improvements But here, too, the enactment of Local Law No. 20 as of May 1, 1962, and the promulgation of section 11 on February 11,1963, — providing among other things for decontrol of former rooming houses upon their meeting certain structural requirements — intervene to make inapplicable the rule of the law of the case.
I hold, therefore, that the principle of the judicial law of the case is not of aid to either party to this proceeding. As a consequence, of course, I proceed to a consideration of other contentions.
In the administrative order under review, the respondent stated the following with respect to his order of April 30, 1964: “ In the opinion of the Administrator a comparison of the physical inspection reports, dated January 12, 1961 and November 3, 1961 indicated that there were no substantial repairs and improvements made' subsequent to the physical inspection of January 12, 1961 (with the exception of the community toilet on the first floor) and the Administrator accordingly found that there had been no substantial repairs and improvements, subsequent to January 12, 1961 and sustained the prior order of the State Bent Administrator. ”
Then, the opinion under review goes on to say, in respect of the intervening conversion to self-contained family units: “ The processing that followed the Administrator’s reopening of the protest proceeding on August 12,1964 indicates that a whole new situation exists in the subject premises. The subject premises have been so drastically altered, that the housing accommodations now existing therein bear no identity with the formerly existing housing accommodations for which maximum rents, subsequently affirmed by both the State Bent Administrator and the City Bent Administrator, were established by the Local Bent Administrator’s orders of January 28, 1960. It is clear that these housing accommodations cannot qualify for decontrol, any more than the previously existing housing accommodations (for the reasons previously indicated), because housing accommodations created by conversion from rooming house accommodations cannot qualify for decontrol under the applicable regulations. (In addition there has been no increase in the number of housing accommodations, as required by Section 11 of the Begulations.) ”
It appears, from the language of his opinion, that the Administrator denied decontrol here on the basic ground that “ these housing accommodations do not qualify for decontrol” — that is, in any circumstances. He contends that, as a matter of law, the 1959 amendment to the State rent law validly recontrolled *128 the subject rooming house accommodations. Section 2 (subd. 2, par. [g], cl. [2]) of the Emergency Housing Bent Control Law (L. 1959, ch. 695), he argues, excluded rooming house accommodations from decontrol upon conversion, by the following language:
£ £ 2. The term ‘ housing accommodation ’ shall not include: # # *s
“ (2) Additional housing accommodations, other than rooming house accommodations, created by conversion on or after February first, nineteen hundred forty-seven”.
I do not go along with the construction placed upon this provision by the respondent. The statute means that newly created rooming house accommodations are not those permitted to obtain exemption from control — not that existing rooming house accommodations cannot be so converted as to be decontrolled.
The statute, moreover, must be read in the light of the language of section Y51-3.0 (subd. e, par. 2, subpar. [i], cl. [2]) of the Administrative Code of the City of New York (Local Laws, 1962, No. 20, as amd. by L. 1963, ch. 100), providing for decontrol of certain premises therein described, if there had been a structural change involving substantial alterations or remodeling of the rooming house accommodations (among other types of residences) and such change resulted in additional housing accommodations consisting of self-contained family units as defined by regulations promulgated by the city rent agency. This clause reads, in relevant part on this point, as follows: “no such order of decontrol shall be issued with respect to housing accommodations of any type resulting from conversion, after April thirtieth, nineteen hundred sixty-two, of rooming house accommodations or of single room occupancy accommodations, and such resulting accommodations shall continue to be housing accommodations subject to rent control under this title and the regulations thereunder ’ ’.
Similarly, reference should be made to section 11 of the City Bent, Eviction and Behabilitation Begulations, which implemented the foregoing enabling legislation. In its pertinent portions, it reads as follows:
“ Section 11. Conversions after May 1, 1950.
“ a. (1) Upon application of the landlord, the Administrator shall issue an order decontrolling additional housing accommodations, other than rooming house accommodations * * * on or after May 1, 1950, if there has been a structural change involving substantial alterations or remodeling and such change has resulted in additional housing accommodations consisting of self-contained family units * * *.
*129 “ (2) The term ‘ self-contained family unit ’ shall mean a housing accommodation with private access, containing two or more rooms, consisting of at least one bed-room and a living-room dining-space area in addition to a kitchen (with cooking and refrigeration facilities and a sink), a private bathroom (with a wash basin, toilet and bathtub or enclosed shower), and at least one closet plus an additional closet for each bed-room. Such accommodation shall contain a minimum total area of 395 square feet exclusive of the area of bathrooms and closets. * * *
“ d. Notwithstanding any of the foregoing provisions of this section, no order .shall be issued by the Administrator decontrolling housing accommodations (1) of any type resulting from conversion after April 30,1962 of rooming house accommodations or of single room occupancy accommodations ”.
I hold, in short, that there is no absolute bar to decontrol by reason of the fact that the conversion involved premises from rooming house accommodations and that the Administrator was in error in so assuming. I therefore do not rest my decision herein on the ground of the Administrator’s basic holding.
I recognize, of course, that it is a precept of administrative law that the courts should give cognizance to administrative rulings based upon the Administrator’s construction of the governing legislation and of his own regulations promulgated thereunder (Bowles v. Seminole Rock Co., 325 U. S. 410,413-414; Lightbody v. Russell, 293 N. Y. 492, 496; Matter of Willmont Liqs. v. Rohan, 2 Misc 2d 768, 781). But this principle is not without exception — • and is not to be applied when the language of the statute and rule clearly requires a contrary holding (Matter of Davis v. Hults, 24 Misc 2d 954; Matter of McDonald Parking Lot v. O’Connell, 9 Misc 2d 516, 517).
It is appropriate here to reiterate passages from my opinion in State of New York v. New York Movers Tariff Bureau (48 Misc 2d 225, 247-248) wherein I quoted from New York Jurisprudence (vol. 1, Administrative Law, § 190, p. 627) and from Matter of Dresher (Lubin) (286 App. Div. 591, 592): " ' Accordingly courts will review challenged action of an administrative agency to determine if it is within the law, and they are not bound by the agency’s determination of questions of law but will determine such questions for themselves. ’ * * * ‘ In reviewing this case, therefore, we lay the decision [of the Unemployment Insurance Appeal Board] alongside the statute and examine in what areas the decision moves in a field of law, and what areas in a field of fact. We are not, of course, bound by the board’s view of the law in the sense we are bound by its view *130 of the facts; our function, rather, is to interpret the law as far as we go ’. ”
The petitioner argues that, at the time when the cut-off date of April 30,1962, was fixed, there was no such calendar requirement in statute or regulation, and points out that such date was not established until the promulgation of Amendment No. 5 to section 11 of the city rent regulations on February 11 of the following year. She urges that such provision should not be permitted to have any “retroactive effect”. No statutory enactments, regulatory rules, or judicial precedents are cited by counsel — pro or con.
The facts on this issue are accurately stated by the petitioner but the characterization of the conclusion is not acceptable. And, while the point is not raised, I think it pertinent, as well, to express my view that there is no constitutional ban in support of the petitioner’s contention.
As hereinbefore noted, in my recitation of the sundry processes of Administrator and court in this matter, the State Administrator recontrolled these premises on April 10, 1961. Judge Backer did not upset this order in his decision of August 15,1961, but remanded the matter for further consideration by the State Administrator for the fixing of appropriate maximum rents. Thus, when Amendment No. 5 to section 11 of the regulations was adopted — in order to make them conform with section Y51-3.0 (subd. e, par. 2, subpar. [i], cl. [2]) of the New York City Rent and Rehabilitation Law (Local Laws, 1962, No. 20, enacted April 24, 1962, eff. May 1, 1962, quoted above) — so as to fix April 30, 1962, as the critical date, the premises were then subject to an existing order of control— which, of course, is not of benefit to the petitioner. (Cf. Matter of Shafer v. Gabel, 16 N Y 2d 513; Matter of Rotham Realty Co. v. Gabel, 16 N Y 2d 517; Matter of East 53rd Inc. v. Gabel, 16 N Y 2d 521.) The petitioner, therefore, has not been deprived by the administrative determination now under review of any property or rights without due process of law, for the law in effect at the time of the Administrator’s order is applicable.
The case of I.L.F.Y. Co. v. Temporary State Housing Rent Comm. (10 N Y 2d 263) is helpful on this issue. There, plaintiff landlord in November, 1960 contracted to purchase for $1,378,000 a rent-controlled apartment house in Manhattan. Title passed bn February 20, 1961, and a week later, the new owner filed with the State Rent Commission an application for the fixation of a reasonable rent computed at 6% return on valuation of $1,378,000 as shown by the sale price aforesaid. *131 On April 6, 1961, and before commission action on the application was completed, the Legislature modified the existing provisions which set up procedures whereby landlords might obtain maximum rent adjustments based on recent sale prices, [L. 1961, ch. 337] by providing that no application for such adjustment shall be filed by the landlord prior to six months from the date of such sale and by providing further that ‘1 no adjustment ordered by the commission based upon such sales price valuation shall be effective prior to one year from the date of such sale ” (Emergency Housing Rent Control Law, § 4, subd. 4, par. [a], subpar. [1], cl. [v]). The landlord sued for a declaration that the amendment was unconstitutional. The Court of Appeals unanimously affirmed a judgment to the contrary, saying (p. 270): “Appellant did not have in any particular rule an interest so vested as to entitle it to keep the rule unchanged [citing cases]. In such situations the applicability and validity of statutes are determined as of the date we make our decision [citing cases].” (see, also, I.L.F.Y. Co. v. Temporary State Housing Rent Comm., 11 N Y 2d 259; I.L.F.Y. Co. v. City Rent and Rehabilitation Administration, 11 N Y 2d 480.)
Moreover, the facts that the State statute and regulation had no cut-off date as to when the conversion must have been completed for the premises to qualify for decontrol, and that it was the city code and regulation which established such date, are of no moment. Section 11 of the Local Emergency Housing Rent Control Act (L. 1962, ch. 21) expressly covers this situation. In relevant part, the statute provides that ‘ ‘ any matter, application, proceeding or protest undertaken, filed or commenced by, with or before the temporary state housing rent commission or the state rent administrator relating to the regulation and control or residential rents and evictions within a city having a population of one million or more [in other words, New York City] and pending on May first, nineteen hundred sixty-two, shall be transferred to, conducted by, and completed or determined by the city housing rent agency. In discharging such responsibilities the city housing rent agency shall act in conformity with the provisions of the state emergency housing rent control law, and the rules and regulations promulgated thereunder, governing such matters, applications or proceedings, unless at the time such action is taken, such state law, and the rules and regulations promulgated thereunder, have been amended or superseded by local laws, ordinances, rules or regulations adopted pursuant to subdivision five of this section, and in such event, in conformity therewith *132 to the extent sneh local law, ordinances, rules- or regulations are made expressly applicable to such matters, applications or proceedings.” (Emphasis supplied.)
Oddly enough, it appears that, were the petitioner circumscribed by the provisions of the State law and regulations — upon which she bases her case — the conversion would run afoul of an express clause therein which she has ignored. That provision is that the ‘‘ self-contained family unit ’ ’ must consist of at least “ one bed-room and a living room dining-space area in addition to a kitchen [or kitchenette] having a minimum total area of 410 square feet for the foregoing rooms ”, and in addition a private bathroom and at least one closet. (See McKinney’s Uncons. Laws, 1966 Cum. Annual Pocket Part, Rent and Eviction Regulations, § 11, [as amd. eff. June 30, 1961; Aug. 1, 1961]). This provision, as .will be seen, is more stringent, in some respects, than the applicable city law and regulation — and even in the latter regard there has not been compliance by the petitioner’s conversion.
The statutes and regulations, properly read and construed, provide that a converted rooming house may qualify for decontrol upon certain conditions and criteria being met. These are that (1) the conversion must result in additional housing-accommodations consisting of self-contained family units (as opposed to the mere addition of rooms or sleeping quarters); that (2) each of the new apartments must have a minimum area- of 395 square feet exclusive of bathroom and closets; and (3) that the conversion - must have been ’ completed before April 30, 1962.
Two things become clear: First, we are not here concerned with a demand for decontrol as to newly created rooming house accommodations. Second, it is the family units created prior to April 30, 1962 which the court is required to consider, for there can be no decontrol by reason of conversion from existing rooming house accommodations to self-contained family housing accommodations if such conversion occurred after that date.
It does not distinctly appear from the Administrator’s opinion that the factor of the timeliness of the conversion had been given consideration, which, no doubt, was his duty to do in the first instance had that been the expressed gravamen of the petitioner’s protest. But, in the circumstances here, I am of the view that a remand on this issue is not justified.
The petitioner now insists that the conversion, according to plans, was completed by that date. In this connection it is worthy of special note that decontrol by reason of conversion *133 to family unit accommodations was not requested upon the original initiation of the application but, rather, such conversion was reported to the respondent in September, 1962, in the course of the reopened protest proceeding leading to the order of April 30, 1964. Nowhere in the record before the Administrator did the petitioner claim or allege that the premises were converted on or before April 30, 1962. That question was thus confronted by the Administrator only in the article 78 proceeding now seeking review of his determination of April 15, 1966.
The petitioner was accorded every opportunity to submit evidence in support of her position. The Administrator served a “Notice of Opportunity to Submit Additional Evidence” (dated Aug. 12,1964) upon the petitioner. In response thereto, the petitioner filed “Landlord’s Statement of Additional Evidence and Facts ’ ’ dated August 26, 1964, with which a number of documents were also presented, and they constitute part of the record before me. No proof of timeliness of conversion was therein or otherwise submitted.
Subdivision 8 of section 1 of chapter 21 (entitled “ Judicial review ”) of the State enabling act with regard to housing rent control in New York City provides that “ No objection to such * * * order and no evidence in support of any objection thereto, shall be considered by the court, unless such objection shall have been presented to the city housing rent agency by the petitioner in the proceedings resulting in the determination or unless such evidence shall be contained in the return ”.
Thus it is that I hold that the petitioner cannot now rely upon any alleged proof that the conversion was completed prior to April 30, 1962. Moreover, none is even now presented, except by way of unsupported assertion. Indeed, a study of the record discloses that the conversion of the rooming house accommodations to apartments was not completed until after April 30, 1962. I shall here note some of the indicia. The contract for the bathrooms (10 in all) is dated May 3, 1962. The initial application for approval of proposed alterations submitted by the petitioner to the Department of Buildings was sanctioned in November, 1961, but modified applications were thereafter submitted and not approved until April 2, 1962. The contract with the general builder, dated March 3, 1962, provides that the “ contractor agrees to perform the contract within 90 working days from March 5, 1962,” indicating that the parties did not contemplate that the work would be completed by April 30,1962. The inspection by the Department of Buildings as to the alterations was made on August 31, 1962. The cer *134 tíficate of occupancy is dated September 4, 1962. In the article 78 proceeding before Judge Helman and the proceeding before me, the petitioner alleged that the conversion was completed on August 31, 1962. The first time that the petitioner alleges an earlier date is in her replying affidavit in the instant proceeding. I therefore come to the conclusion that the critical date of April 30, 1962 occurred to the petitioner as a post-Utem after-thought — and is unproved as a fact.
Nor is that all in the record which defeats the petitioner’s claim. As I have pointed out hereinabove, section 11 of the City Rent, Eviction and Rehabilitation Regulations establishes a further requirement to be satisfied for decontrol of premises thereunder. That prerequisite is that each converted “ self-contained family unit” must “contain a minimum total area of 395 square feet, exclusive of the area of bathroom and closets.”
In his brief, the respondent states that only one of the apartments meets the minimum requirement. Unfortunately, again, the problem as to factual qualification in this respect does not appear to have been fully developed in the respondent’s opinion. But, also again, I am of the view that the full record before me does not once more justify remand to the Administrator rather than definitive disposition by the court.
Available in the record on this issue are the conversion plans submitted by the petitioner and the Administrator’s intramural memorandum thereon. They show the following areas in square feet:
Basement front.......... 342.0
Basement rear .......... 377.0
First floor front......... 282.9
First floor rear.......... 508.9
Second floor front........ 335.7
Second floor rear......... 551.1
Third floor front......... 366.7
Third floor rear.......... 275.0
Fourth floor front........ 370.2
Fourth floor rear........ 215.0
Thus, the petitioner’s own proof reveals that in only 2 of the 10 newly created dwelling units is there a total area of 395 square feet or more. That is clearly not an adequate compliance— actually or substantially — with the requirement of the regulation.
Finally, whatever error of administrative law I may have fallen into, or whatever act of lése majesté I may have committed *135 vis-a-vis the Administrator in resolving — as I have hereinbefore done — the factual questions of timeliness and space, without obtaining the respondent’s prior determination thereon (cf. Matter of Punnett v. Evans, 26 A D 2d 396), pales into insignificance, I think, in the face of the present record on another fundamental factual defect in the petitioner’s case — that of the absence of an increase of housing accommodations. For, in addition to the specifications of date and area, hereinbefore discussed, that third basic criterion is plainly established by statute and regulation. And there can be no doubt that it was explicitly decided by the Administrator in the instant case — albeit not delineated in his opinion by way of a discussion of the evidence, and expressed by him only parenthetically and. seemingly as an appendage to his primary ruling that: “ (In addition there has been no increase in the number of housing accommodations, as required by section 11 of the Regulations) ”.
I shall now consider the factual basis in the record for this supplemental ground of the Administrator’s decision.
The petitioner urges that, prior to the alterations, there were II furnished rooms, and that subsequently these were made into 10 self-contained family units. This assertion is at variance with the record. The specifications submitted to the Department of Buildings, and approved April 12, 1962, enumerate the then existing rooms under legal use as 12 and the proposed occupancy to be 10 apartments. A protest to the State Rent Administrator, sworn to by the petitioner on February 17, 1960, indicated that the petitioner’s premises contained 12 furnished rooms. This same number of rooms was found to exist in an inspection by the State Rent Commission made on December 23, 1959. The ensuing report noted that although there were 4 vacancies at the time, the remaining 8 rooms were occupied by individuals and families comprising 39 persons in all. The petitioner further asserts that the converted apartments, although 10 in number, actually include a total of 28 rooms (17, according to the respondent’s return, if kitchen facilities are excluded), and he argues that, presumptively, family units accommodate more persons than single occupancy rooms.
I agree that, on its face a conversion from 11 to 28 rooms, as the petitioner contends (or to 20 rooms, as specified in her alteration application to the Buildings Department, and as held by the Administrator) elicits the question whether there has been compliance s.o substantial as to require a determination that the necessary increased housing accommodations have been created, particularly in the light of customary single occupancy of single rooms, not self-sustained, in a rooming-house opera *136 tion, while family accommodations, which are self-sustained, are occupied normally by two or more persons, considering the number of rooms in the 10 units running from two to four, as the petitioner contends. Apparently this increase in the number of rooms was accomplished, at least in part, by use of spaces or areas not put to room use when the building was a one-family residence or put to use as rooms in the rooming house.
None of this was fully explored in the opinion under present review. Nor is the record clear as to the actual number of persons legally occupying each accommodation before and after the conversion. The file does show that prior thereto there were 12 furnished rooms equipped with gas stoves and refrigerators, and that following the changes, there are 10 apartments, consisting of a total of 20 rooms, each apartment being equipped with a bathroom and kitchenette. Such a record compels me to sustain the Administrator’s determination, for it is not the prospective increase in the number of persons who will occupy the converted premises, but rather an increase in the number of converted legal units over the pre-existing legal accommodations, and in the case at bar, 1‘ the existing legal units are now fewer in number ” (see Matter of Boss v. Caputa, per Nathan, J., N. Y. L. J., April 1, 1959, p. 12, col. 1, affd. 9 A D 2d 730, affd. 8 N Y 2d 1127). As stated by the Appellate Division in the Boss case (supra): “ A fair reading of the statute evinces the legislative purpose to condition decontrol upon the creation of additional housing. So reads the statute and we so hold. Tested by this standard, the appellant created no additional housing by reason of' the alterations described * * * and the respondent properly refused decontrol thereof.”
Basically, decontrol was denied by the Administrator here, not as a matter of time limitation or of area inadequacy or even of failure to effectuate an increase in housing accommodations, but rather of total lack of legal warrant for decontrol in any circumstances — since, to repeat what he stated in his opinion, it his view that “ It is clear that these housing accommodations cannot qualify for decontrol, any more than the previous existing housing accommodations (for reasons previously indicated), because housing accommodations created by conversion from rooming house accommodations cannot qualify under the applicable regulations.”
As held by Judge Steuer, in Matter of 319 West 108th St. Realty Corp. v. McGoldrick (19 Misc 2d 678, 679) the “ respondent’is conclusion is somewhat obscured by the fact that it is placed partly on the ground that no new family unit was brought into existence. Despite the error in that *137 respect the fact remains that it was also placed on the absence of a substantial alteration. As to that the question is not so free from doubt to warrant interference.”
I hold, therefore, that the circumstance that the determination of the respondent of this last issue was “ somewhat obscured ” is not such an Achilles heel as to warrant vacating the order of recontrol or even to require on the basis of this record further hearings administratively or judicially on the facts. The applicable statute provides that “No regulation or order of the city housing rent agency shall be enjoined or set aside, in whole or in part, unless the petitioner shall establish to the satisfaction of the court that the regulation or order is not in accordance with law, or is arbitrary or capricious.” (Local Emergency Housing Bent Control Act, § 8 [L. 1962, ch. 21] [entitled: “ Judicial review ”]; see, also, Administrative Code, § Y51-9.0, subd. b; Matter of Motta v. Temporary State Housing Rent Comm., 202 Misc. 341, 345.)
Sufficient ground exists upon the record herein to support the order and it should not be disturbed. (Matter of First Terrace Gardens v. McGoldrick, 1 N Y 2d 1, 3.) The application is denied, and the proceeding is dismissed.